Good morning. My name is Charles Nichols. I'm the Appellant in Pro Per. May it please the Court. I had intended to ask for a couple of minutes to make an opening statement, but in light of the panel's submission by the related case of Young Vigil, Hawaii, which may decide the Second Amendment claim, at least to the licensing. I'm sorry, how do you intend to ask for? I have intended to ask for a few minutes to make an opening statement or argument concentrating on the Second Amendment, which I think is why we're here. Well, it's a different statute. I'm sorry? It's not. I mean, that other case will have priority and we will probably have to wait for it, but it's not necessarily dispositive and we'd like to hear your argument because the statutes are not the same. My argument is very simple and I think it's clear from the briefs. My argument is that the Supreme Court decisions are binding, particularly the decision in McDonald, which incorporated both the Second Amendment in full against the state and it incorporated the right to find in Heller against the state. The appellee's argument is that, curiously enough, they opened with that McDonald thought that the historical analysis was dispositive and then they weave their own historical analysis and they ask this court to substitute their analysis for the analysis in Heller and McDonald. So there is a right to bear arms, to keep and bear arms outside my home. Outside your home? Yes. Well, in my home as well if my home happens to have wheels. Heller spoke of defense of hearth and home. He did. He also said that the core right is self-defense and then he applied and then the court in McDonald, well, I have the opening line to McDonald is that the court held two things. We held that self-defense was an individual right, a core right, and we struck down a ban on the possession of handguns in the home. There is absolutely nothing in Heller which could lead one to believe that the Second Amendment right is confined to the interior of the home and that's what we are facing here in California because really it isn't in dispute. The moment I step outside the door to my home carrying a loaded firearm or an unloaded modern firearm, I'm violating the law. I'm breaking the law. Do you think that gets you to either strict or intermediate scrutiny? My argument is… Or do we have to consider the historical record? I think you should accept the Supreme Court's historical interpretation. Well, I've asked you a slightly different question. Even if we thought that the core right of self-defense applied wherever one went… Well, not wherever one went. I understand there might be some limitations for public spaces and so on, but you're arguing that you get to go a lot of places at least with a gun. You don't get to come into a federal courthouse or a school or a library. My argument mirrors the right defined in Heller. But the court in Heller also talked about understanding the scope of the right as limited by the historical record, that is that we accept historical limitations on the right to bear arms outside of the home. So the state has made a very extensive argument that the scope of the right to keep and bear arms historically has been understood as being limited and that one could not carry guns publicly. They're talking about the statute of Northampton. It goes back to the 13th century and that there were many restrictions by states and others. Now, what's your response to that? The statute of Northampton, if this were an English court, might be relevant. This is an American court. What is relevant here is the Constitution of the United States. Right, but we drew many of our rights from England. We did, and then we expanded on those rights. This is not 1689 England. In fact, if this were 1689 England, I could carry arms openly. So what do you do with the evidence that many states at the time of the adoption of the Constitution had restrictions on open carrying of arms? They did not have the restrictions that the court alludes to, and the court in Wren recognized that. They didn't have what, I'm sorry? They had certain surety laws. You couldn't go around threatening people. You just couldn't go around carrying it. No, you could. That's not what they said. Well, it's not what they say, but if you actually look at their citations, that's not what their citations actually say. I have them all. My understanding is you couldn't go around carrying them because that was threatening, not you couldn't go around specifically threatening while carrying them. In other words, carrying it was threatening, which it is often. That's not what the courts have found. That's not what their own citations. That's what they say their citations claim. That's not what the claims found. You had to be doing something other than carrying a firearm. You had to be either threatening people or you had to be riding a horse into a church or you had to do something in terror of the people, and the mere carriage of a firearm was never in any of their citations. As I said, I have them here. If you think they have a brilliant 19th century case, which we can look at it here. I've got them. We can go over it. And as I said, the court in Wren completely rejected their ‑‑ they made the same argument that Washington, D.C. did in Wren as the court did here. And the court said whatever the limitations in Wren, the court said whatever limitations existed on English shores far away a long time ago are not relevant here. In fact, the court said all of these citations, which was also made by the appellees here, are zapped of authority by Heller. Heller said, you know, Chandler, citations of Chandler, shields the right to open carry. Heller did not, or MacDonald, did not specifically discuss carrying laws because that wasn't what was at issue there, right? Heller ‑‑ It made some statements. It did. Excuse me. Which do seem to state the right of self-defense as not limited to the home. That's what the minority right is. But they didn't specifically. But that's different from the question of whether restrictions on carrying guns openly in public were or were not recognized historically. There were restrictions. You couldn't go around threatening people, regardless of whether the arm was carried openly or concealed. But there was not ‑‑ the only restrictions that you'll find is that some states considered concealable handguns to be dangerous and unusual weapons. Those same states excluded handguns which were not concealable, such as the .44 caliber Colt Walker, which is an overall length of 15 inches. You can't hide that, conceal that in a pocket. But that was only limited to handguns. My case isn't limited to handguns. I seek to openly carry long guns as well. You're not going to find a single case in the appellees are not cited in any case which has held that long guns are dangerous and unusual weapons. Counsel, in our en banc decision in Peruta, didn't we refer to old English cases going back to the 13th century? As applied to concealed carry, certainly did. Right. So this goes to methodology, since Wren isn't exactly on point, but you cited Wren as rejecting the idea that we could look to preconstitutional English history. But we did exactly that in Peruta. Wouldn't this panel be bound by our methodology in Peruta rather than the D.C. Circuit's decision in Wren? Not as applied to concealed carry. The court said it was applying the two‑step process in Chauvin, and both Moore and Wren said that the historical analysis had already been made by the Supreme Court. So you look to the historical analysis made by the Supreme Court? Moore was dealing with an absolute ban statute, apparently the only one. Well, the California 1967 ban was patterned after the Illinois 1962 ban. That's certainly not an absolute ban. For one thing, it has many exceptions, of which one of them is imminent danger, an actual immediate need for self‑defense, which seems to be the core of what was being recognized in Heller. Under Illinois law, it was an affirmative defense if one found oneself facing serious bodily injury. But since there is an exception for imminent danger, isn't that the core of what was recognized in Heller? Oh, the core right is in recognizing Heller, and keep in mind that Heller said the central component of the right was self‑defense and that the right secured the right of an individual to openly carry arms in case of confrontation. It didn't say you had to wait until after you were confronted. That would be silly. Where is that handgun or rifle or shotgun going to come from? If you have to wait until you've already been facing grave immediate danger, which is the case in California. I'm walking around the block. Someone pulls a knife on me. What am I going to do? No gun, no firearm is going to magically appear. I'm disarmed. I step out. I don't even have to walk around the block. All I have to do is step out the door of my home to the curtilage of my home, and any mugger or person who wishes any harm, the law is not going to stop them from being armed, but I'm prevented from being armed. You began, I think, by saying you weren't going to argue the Second Amendment, and then I got you to argue the Second Amendment. You did. Why did you say you weren't going to argue? Well, I was going to. The Fourth Amendment is just as dear to me. How about the Fourth Amendment? It never happened to you. In other words, why are you standing on the Fourth Amendment question? The chamber check? Yeah. It did happen to me. There's a video of it lodged with the court. It happened to you when? Redondo Beach, California. I believe it was May of 2012. Pursuant to the state law? I'm sorry? Yes. That's what the police officer said. That's stated in my complaint, that when Officer, I believe it was Haywood, enforced Penal Code Section 25850B on me, created a distinct and real issue for this court. So, you know, I wish to have it. It's happened to me before, and I want to make sure it doesn't happen again. Now the Appalese argument is they wish to return California to the pre-Map V. Ohio days when police officers could legally stop you and search your personal property for no reason. There was no exclusionary rule in California. You know, I would like to, I think if there's anything to my Fourth Amendment citations, it's a person has a right to refuse to consent to a search. That's how this comes up under the statutes, which as I understand it, now preclude, at least in some instances, open carry of an unloaded gun. If you take all the statutes I've cited in my briefs as a whole, basically the only thing I can carry outside my home is an unloaded antique long gun because California's gun-free school zones are just everywhere. You know, you can't throw a rock without it landing within 1,000 feet. Unloaded what kind of, a long gun? Unloaded antique. I can carry a musket in public in California even within 1,000 feet of a K through 12 public or private school, but I can't. If you're walking around with a gun. A musket. A musket. That in itself is illegal. If you don't have a license and you're not one of the accepted people and it's not your business. If the firearm is manufactured after January 1, 1899, it's illegal for me to openly carry it in public. So then the police, is it that it's a different crime if you have a bullet in the gun than if you don't? I mean, there's that kind of ratio anyway, in other words, whether there's a bullet in there or not, right? Which is illegal. That's a violation of the Fourth Amendment. Why is that a Fourth Amendment? Why is it a violation of the Fourth Amendment? Yeah. Because you need probable cause to make an arrest. Well, if the statutes are otherwise valid, you'd have probable cause. That's for walking around with a gun loaded or unloaded. Okay. I cited Muniz in my. I'm confused. That's not a Fourth Amendment violation if the statute's valid, right? Well, the Muniz held that the sight of a firearm does not constitute probable cause. That law has been broken. But on this premise, a law would be broken, because although you're challenging them, if they're valid, then you're not supposed to be walking around with a gun. If I were walking around with a container, a briefcase, the police officer stopped me without probable cause of reasonable suspicion. That's what this is. Without a suspicion, this is a suspicion on the search. Opened it up, and I had illegal drugs in it. You're walking around holding a visible gun. The drugs. Excuse me. If you're walking around holding a visible gun. Which is not a crime. Why is it not a crime? If it's an antique, as applied to me. Right, if it's an antique. It's clearly not an antique. If I were a lawyer, I could openly carry a modern firearm. You could do what? If I were a lawyer, I could openly carry a modern firearm. Okay. So the problem is you wouldn't know you weren't a lawyer if he saw you. The officer would not know that I'm not a lawyer, no. Now, what do you know? You wouldn't know if I'm not a zookeeper or a police officer who's out of uniform because the law does not require the police to be in uniform to be exempt from the ban. You wouldn't know if I'm a hunter, which I extensively made to my grades. Today I could have driven to court with a shotgun in the back of my pickup truck, prominently displayed, perfectly legal. I could have gone out if I were younger. Five miles from here is legal hunting in the Angeles National Forest. If a police officer saw me walking down the street with a shotgun, as far as he knows, I'm walking to go hunting, perfectly legal. I'm exempt from the open carry bans. Whether or not it's loaded? Well, there's a definition of loaded for hunters, which is loaded for the rest of us, but unloaded for hunters. If there's no live round in the firing chamber and I'm a hunter, it's unloaded. If I'm not a hunter, that same rifle or shotgun is loaded. You're over your time. I'll give you a minute of your time. Thank you. Thank you. Thank you. May it please the Court, I am Jonathan Eisenberg, Deputy Attorney General on behalf of California Governor Edmund G. Brown, Jr., and California Attorney General Javier Becerra. I would like to emphasize two points in my presentation. These points have been discussed already, but I wanted to focus my presentation on them, unless, of course, the judges have other questions. The right that Mr. Nichols is claiming is very specific and precise. It is not a public carry right. It is an open carry right. Not only is it an open carry right, but it is the right to carry a firearm openly in public for any lawful purpose, essentially anywhere or at any time except in sensitive places, for example, this courtroom. That right is not a recognized right as part of the Second Amendment. We have Peruta. Now, the statute in Peruta did allow some people to get licenses, right? Correct. So it wasn't a complete ban, and it had other exceptions. Correct. And this one has exceptions. I mean, I think the obvious response to your argument is, well, if you can't carry it concealed and you can't carry it open, then you can't carry it. So even though he's concentrating on the open one, we've already established that the closed one is valid, but it's limited. It's not complete. Correct. Neither of the regimes is a complete ban. In addition, the position that the state is taking, as we indicated in one of the footnotes in our brief, is not addressing and is not dispositive of this other question that's admittedly lurking in these cases and was referenced in Judge Callahan's dissenting opinion in Peruta about whether the state must recognize a public carry right but could define the mode. In other words, the state must allow ordinary law-abiding citizens, not otherwise prohibited from possessing firearms, to carry either openly or concealed, I guess, or both, but the state may choose. That issue, which is the issue I think you're referencing, is not the issue in this case. That issue has been disclaimed by Mr. Nichols. Additionally, that issue may be being addressed in the Hawaii case that was mentioned earlier. So this case truly— I mean, one problem is we probably have no choice but to wait for the Hawaii case because they have priority and they could write an opinion that would— Statutes are quite different, as I understand it. But still, until we know what they've decided, we presumably don't proceed separately. Although we could come out differently, possibly. Correct. I do believe that this case is distinct from that case because of the way it has been framed. It's distinct because of his focus on only open carry and also, I guess, distinct because the statutes— much more nuanced statute than what's in Hawaii. I believe that is true, Your Honor, although I haven't studied the Hawaii statute as carefully. Again, the state accepts the framing of this case and believes that it can be decided in isolation without waiting on another opinion. Obviously, the young opinion covers similar subject matter and may have implications for this case just as this case may have implications for that case. But again, because of the very precise way that Mr. Nichols has framed the case, this case is a standalone case that the court can decide on the very specific question of unfettered open carry being part of the Second Amendment. The second question is, do we proceed on the historical record theory or do we proceed on a scrutiny standard, probably an intermediate scrutiny because it's not a core right. It's not in the home and it's measured. It's not complete. But if we do it by the historical record, which seems fairly— first of all, do you want to respond to the critique of the historical record and the notion that, in fact, the statutes were only about actual threats and not simply carrying? Absolutely. The second point that I've been planning to emphasize in my presentation is that the historical analysis is or should be dispositive in this case. The statute of Northampton, Sir John's Night case, a lot of the history that was discussed in the Peruta opinion and the historical presentation that the state has made here does not comport with Mr. Nichols' contention that there was an open carry right and that the limitation was merely on threatening someone overtly with a firearm. It was rather that open carry was threatening. It was naturally threatening. A person did not need to do more than just open carry. A person did not need to shout and scream or brandish the weapon. There are brandishing laws that exist that are separate from the statute of Northampton, separate from open carry and concealed carry regulations. California adopted essentially a prohibition on brandishing weapons right at the beginning of statehood in 1850, Penal Code Section 417, and it's still on the books. California didn't adopt an open carry statute until the 60s. Is that right? Correct. The open carry statute that has been somewhat amended but is essentially the same law at issue here was adopted in 1967. Do you agree with Mr. Nichols' characterization that the D.C. Circuit in Wren rejected the use of historical materials from England prior to the adoption of the Constitution? Well, I do believe that the Wren court conducted a very different historical analysis than this court did in Peruta. But as Your Honor pointed out, this court's decision in Peruta, an en banc decision, is binding on this panel, and furthermore, it's the position of the state that it is correct, and the Wren interpretation of history is incorrect. My recollection of Heller is that Justice Scalia's opinion relies on a fairly broad spectrum of historical materials, including blackstone. Absolutely, and that is why your point was correct, that it is necessary when conducting the historical analysis to look to the law of England. It's just exactly what Justice Scalia did in Heller, and it's just exactly what the en banc not certain. Would it be relevant for us to look to the laws of any other jurisdiction other than England? I believe that to follow Heller, Justice Scalia laid out an organization of the materials that he looked at, and he described how certain materials were more probative and other materials were less probative. The point of reference is 1791, when the Second Amendment was adopted. The goal of the analysis is to understand what the people who voted on the Second Amendment would have understood the scope of the right to be. So as you move backwards in the past from 1791, you get further away from that understanding. Likewise, as you move forward closer to the present, you move further away from that understanding. However, Justice Scalia did say that laws from England going back hundreds of years before the American Revolution were probative, and he carried the analysis using American case law as well as commentators until around the end of the 19th century. And that is set forth clearly as the way the courts are supposed to proceed in this kind of analysis. And to pick up on a point that Judge Berzon made, this case would not require the court to get to that second step in Chauvin of choosing an appropriate level of scrutiny because as, you know, the extensive history that we laid out here and as was endorsed in amicus briefs, et cetera, and in fact echoes a lot of the historical analysis in Peruta, it's very clear that there was no unfettered open carry right as Mr. Nichols is proclaiming. You want to address the Fourth Amendment? I'm happy to address the Fourth Amendment issue. The state's position echoes what I believe the implications of the questioning of Mr. Nichols were. If there is no right to carry a firearm openly in public in California, then a peace officer has probable cause to invoke Penal Code Section 25850 and conduct a chamber check. It's important to note that the check is not like what Mr. Nichols was hypothesizing about somebody opening up your briefcase and finding something in there. The law is limited to looking at the inside of the barrel of the firearm. There's a California case from 1970 which the state believes is correct. So does this depend on whether we, assuming that we thought that there was a constitutional right to open carry, do we have to define that as open carry loaded or unloaded? Because if we define it as loaded, then there would not be any, then the officer won't have any reason to stop anybody. Is that correct? Right. You know, the state concedes that the Fourth Amendment claim here lives or dies with the Second Amendment claim. If there is nothing illegal, nothing criminal about carrying a firearm openly in public, including loaded, then there would be a force. And by loaded, does that mean chambered or does it just mean sort of accessible? Well, there are different definitions of the term loaded in different parts of California statutes. We not, I do not believe that that definition of loaded is integral to how the court should decide this case. But our understanding is that it would be a live chamber in the barrel ready to be fired. But what about his point that, I mean, that the California statute does let some people carry, at least carry guns publicly and openly. Yes. So how do they know who it is? They have to know who it is first? In other words, in order to have, if you look at it as, either if you look at it as a privacy right or you look at it as a probable cause question, if some people are allowed to carry guns, then presumably some people have some sort of a privacy interest. Well, I would refer back to the 1970 opinion. I believe. Well, it's not a binding on us, right? It's a California opinion. Absolutely, it's not binding on you. And I'm sorry, I'm not meaning to imply that it is binding. I'm meaning to imply that the reasoning is persuasive. There is no privacy right that a person has in the barrel of a firearm. Frankly, that doesn't, I don't know how important this is to the overall regulation, but it doesn't sound terribly logical to me just saying it's inside an object nonetheless. You could have something else in there, an Ebola. Right. The state's position is that the privacy right is at an absolute minimum there. There's nothing else that should be in a firearm barrel. Are you arguing something like an automobile exception for guns, essentially, which may be just as sensible, may be more sensible than the automobile exception, but is that essentially what you're arguing? Well, I think, do you mean that you can search an automobile incident to an otherwise lawful search? Is that what you mean? You can search an automobile without a warrant, but not without a probable cause. Right. I don't think that that situation. But it's because there's some notion that there's less privacy interest in automobiles and they can run away from you and so on. The only purpose of 25850 that we understand animates the law is public safety and particularly the safety of the officer, wanting to know if the firearm that the officer sees is loaded or not. That's the only thing that the peace officer is supposed to be checking. A person does not have a Fourth Amendment right of privacy in public as to whether the firearm that the person is carrying around, and it's probably almost certainly scaring other people, is loaded or not. No person, including the person who has a right to carry the firearm? It's independent of the right to carry the firearm. The peace officer, sorry, it's independent of the right to carry the firearm if it's based on a statutory exception. It's, again, I do want to emphasize that I believe this issue is secondary to this decision, and Mr. Nichols has expressly said he wants the open carry question decided and he disclaims anything else. It's secondary. Moreover, even if we evaluated it, it would be one statute, not the rest of it. True. Okay. I see that I'm, may I? Please keep going. Go ahead. The state's position is that the chamber check, and it is, again, it's limited to a chamber check. It does not authorize the peace officer to search the rest of the person or to search the person's briefcase or to search the person's automobile. It is a very limited intrusion on something that is an absolute minimal privacy right. So the Fourth Amendment is a very— I suppose somebody could be carrying cocaine in the chamber of their gun. I mean, maybe they could be carrying jewels in the chamber of their gun or notes in the chamber of their gun. Who knows? I suppose that if the person was arrested for carrying cocaine inside the barrel of the gun, the person would have another— I don't know. For some reason, they're hiding love notes in the chamber of their gun. I don't know. I don't believe those scenarios would implicate 25850. I believe that those scenarios would implicate whatever other criminal statute— But his objection is to opening it up. I mean, once you opened it up, it would be in plain view and you presumably could take it if it were otherwise contraband or evidence of a crime or something. You know, I am not certain if that would be considered to be plain view or not, given that the—I mean, that seems like a question that's just not before the court. I would be nice if it were, but I don't think—I don't know any theory on which it wouldn't be. Right. Again, that's not a question before the court, but we would say that 25850 is not related to searching the firearm for cocaine. It's related to searching the firearm to see if it is loaded and presents a danger. Can I ask a question that's not been the main topic here at all in this case? But what's the state's view on the validity of the dismissal with prejudice of the state constitutional claims? And I'm not talking about the issue with Governor Brown, but with regard to the state constitutional claims. Well, we have two points. The Coalition to Defend Affirmative Action decision of the Ninth Circuit from 2013 governs and says that this court is not empowered to enjoin a state officer for an alleged violation of state constitutional law. Secondly, if the court here were to reach the merits, the claim has to fail because there's no Second Amendment analog in the California Constitution. So wouldn't the appropriate remedy be instead of dismissal with prejudice, dismissal without prejudice so that if a party sought to raise state constitutional issues, they'd do so at the state court level? The state concedes that that might be correct, Your Honor, but it would be a futile claim in state court. I understand your futility argument in the brief as well, but is it appropriate for this court to reach the futility argument? We do not believe that it's necessary to the decision in this case. The answer is it's not because if we don't have jurisdiction, we don't have jurisdiction. Right. Right. You thought faster than I did. I was actually going to get there, I promise. I made my preliminary point first. I see that I'm way over my time. That's fine. Thank you very much. Thank you, Your Honor. Thank you, Your Honors. Yes. Second. Chancellor Judge Bybee's question, which we never got around to, both the Seventh Circuit and the District of Columbia Circuit Court of Appeals apply the two-step inquiry. In Wren, they didn't believe it was necessary to apply it. They just simply categorically made a categorical decision. In Moore, the Seventh Circuit accepted the historical analysis made in Heller and McDonald and didn't explicitly apply a level of scrutiny. It just commented on the ñ it criticized the level of scrutiny made by other circuits and said that the state would have to provide something more than intermediate to justify the bans. It didn't explicitly say strict scrutiny. Thank you for recognizing you don't have jurisdiction. My reply brief explicitly said that I don't want to litigate the merits of the state law claims. I wanted to do that in state court, should I fail here. Finally, I'd ask you to look at paragraphs 9 and 10 of my operative complaint. The cartilage of my home is part of my home. I'm prevented from carrying a loaded firearm in the cartilage of my home. In paragraph 10, I allege that if I ñ someone who's living out of a motorhome or in a motorhome can't have a loaded firearm at all because the inside of his motorhome is considered to be a public place under California law. Thank you very much. Thank you both for your argument. The case of Nichols v. Brown is submitted and we will take a short recess. Thank you.
judges: Berzon, Bybee, Gleason